## ALLIS-CHALMERS MFG. CO. v. UNITED STATES.

### Civil Action No. 2462.

District Court, E. D. Wisconsin.

Sept. 23, 1946.

Lines, Spooner & Quarles, by Charles B. Quarles and William E. Brown, all of Milwaukee, Wis., for plaintiff.

Timothy T. Cronin, U. S. Atty., by E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis. (John F. Sonnett, Asst. Atty. Gen., J. Francis Hayden, Sp. Asst. to Atty. Gen., Cecilia H. Goetz, and Leon Malman, Attys., War Department, both of Washington, D. C., of counsel), for defendant.

STONE, District Judge.

This action commenced pursuant to the provisions of Section 13 of the Contract Settlement Act of 1944, 41 U.S.C. Sec. 101 et seq., 41 U.S.C.A. § 101 et seq., and under the Tucker Act, 28 U.S.C. 41 (20), 28 U.S. C.A. 41 (20), in which plaintiff seeks to recover damages alleged to be due it from defendant on its termination claims is a statutory proceeding governed by the terms of said Act and by the administration regulations issued pursuant thereto. These include the regulations and termination cost memoranda issued by the Director of Contract Settlement pursuant to Section 4(a) and 6(d) of the Act; the Joint Termination Regulations issued by the War and Navy Departments pursuant to section 6(d) of the Act.

The plaintiff, a corporation incorporated under the laws of the State of Delaware, licensed to do business in the State of Wisconsin and having its principal office and place of business in West Allis, Wisconsin, entered into certain contracts with the Cleveland Diesel Engine Division of the General Motors Corporation to manufacture various materials needed for the execution of a contract between the latter corporation and the United States of America, acting through the War Department, which related to the prosecution of the war. Prior to the completion of these contracts, the United States, for its own convenience, terminated the prime contract which had the effect of terminating work under plaintiff's subcontract.

On September 25, 1944, plaintiff made an agreement with the United States governing the settlement of all its termination claims arising under such contracts and incorporated the Uniform Termination Article promulgated by the Director of War Mobilization on January 8, 1944, into all such contracts.

In settling plaintiff's termination claims in this action a dispute arose as to whether Wisconsin State income taxes should be allowed as a cost in determining fair compensation. The defendant then contended that the Wisconsin State income tax was not an allowable item of costs in the termination settlement, while plaintiff maintained that it was.

The agreement executed May 10, 1945, contained the following provisions:

"In the determination of the expenses of the Company, allowed in this settlement, Wisconsin State income tax and other state income taxes based on net income were disallowed as an item of administra-

tive expense and no allowance was made in in the settlement for such taxes. It is agreed that if the appeal of the Company from the ruling that such taxes are not an allowable item of expense results in a decision favorable to the Company, an adjustment will be made whereby the Company may recover said tax expense applicable to this settlement. If it is determined that said tax expense should be computed as a cost of doing business the amount of such payment due to the Company will be $1,592.44. If it is determined that said tax expense should be computed upon the net income received under the settlement that amount of such payment due to the Company will be $833.40."

Section 6 of the Contract Settlement Act of 1944 provides as follows:

"(a) It is the policy of the Government, and it shall be the responsibility of the contracting agencies and the Director, to provide war contractors with speedy and fair compensation for the termination of any war contract, in accordance with and subject to the provisions of this Act, giving priority to contractors whose facilities are privately owned or privately operated. Such fair compensation for the termination of subcontracts shall be based on the same principles as compensation for the termination of prime contracts.

"(b) Each contracting agency shall establish methods and standards, suitable to the conditions of various war contractors, for determining fair compensation for the termination of war contracts on the basis of actual, standard, average, or estimated costs, or of a percentage of the contract price based on the estimated percentage of completion of work under the terminated contract, or on any other equitable basis, as it deems appropriate. To the extent that such methods and standards require accounting, they shall be adopted, so far as practicable, to the accounting systems used by war contractors, if consistent with recognized commercial accounting practice.

\* \* \* \* \* \*

"(d) Except as hereinafter provided, the methods and standards established under subsection (b) of this section for determining fair compensation for termination

claims which are not settled by agreement shall be designed to compensate the war contractor fairly for the termination of the war contract, taking into account—

"(1) The direct and indirect manufacturing, selling and distribution, administrative and other costs and expenses incurred by the war contractor which are reasonably necessary for the performance of the war contract and properly allocable to the terminated portion thereof under recognized commercial accounting practices; and \* \* \*."

The Statement of Principles for Determination of Costs upon Termination of Government Fixed-Price Supply Contracts, approved by the Joint Contract Termination Board December 31, 1943, and made effective by Directive Order No. 1, issued January 8, 1944, as amended by General Regulation No. 5 of the Office of Contract Settlement September 30, 1944, provides as follows:

"1. General Principles. The costs contemplated by this Statement of Principles are those sanctioned by recognized commercial accounting practices and are intended to include the direct and indirect manufacturing, selling, and distribution, administrative and other costs incurred which are reasonably necessary for the performance of the contract, and are properly allocable or apportionable, under such practices, to the contract (or the part thereof under consideration).

\* \* \* \* \* \*

"4. To the extent that they conform to recognized commercial accounting practices and the foregoing Statement of Principles, the established accounting practices of the contractor as indicated by his books of account and financial reports will be given due consideration in the preparation of statements of cost for the purposes of this article."

Termination Cost Memorandum No. 1 issued under Regulation No. 14 of the Director of Contract Settlement February 22, 1945, provides in part as follows:

"2. Definition. For purposes of these termination cost memorandums, costs and expenses 'sanctioned by recognized commercial accounting practices' are defined as

those costs and expenses which are reasonably incurred in the conduct of a business and are expected to be recovered from the selling price in customary business transactions. In general, they include all the costs necessary to conduct a business except those specifically precluded by the Statement of Cost Principles. Such costs are generally broader in scope than those ordinarily contemplated in factory cost accounting and those recognized by the Government for purposes of cost-plus-fixed-fee contracts. They include, in addition to direct and indirect factory costs, selling, distribution, administrative, financial, and general expenses incurred in the conduct of a business.

"3. Interpretations. a. The references in the Statement of Cost Principles set forth in paragraph 1 above indicate that 'recognized commercial accounting practices' are intended to represent the over-all criterion for costs applicable to terminated war contracts. To be recognized, the accounting practices of a war contractor must be sound when tested on an objective basis, such as substantial use by similar organization, acceptance by independent public accountants, or recognition by other authorities. Accounting practices not supported by these tests must be justified by the contractor through the submission of other satisfactory evidence as to their soundness.

"b. There may be more than one acceptable practice with respect to the accounting treatment of individual items in a contractor's settlement proposal. However, where a contractor has consistently followed an acceptable practice which is applicable in termination, it is expected that such practice will be adhered to. Financial statements, tax returns, or other reports prepared by a war contractor shall be indicative rather than controlling in determining the acceptability of the accounting practices applied in the preparation of termination settlement proposals."

Paragraph 542.2 of the Joint Termination Regulation issued by the War Department and the Navy Department November 1, 1944, provides as follows:

"Application to Negotiated Settlements. In settlements of prime contracts and sub-contracts by agreement, the Statement of Principles will be taken into account to the extent stated in paragraph 532.2."

The "Statement of Principles" here referred to is the Statement of Principles issued by the Joint Contract Termination Board quoted above. The paragraph 532.2 is another portion of said Joint Termination Regulation reading as follows:

"Consideration of Costs.—(1) The cost principles set forth in paragraph 551 reflect certain policies regarding the types of costs which should ordinarily be taken into account in determining fair compensation for the termination of a war contract. Costs of the types allowed by these principles should be considered in a negotiated settlement based on costs. Conversely, such a settlement should not be made a means for reimbursing expenditures of the types excluded by these principles.

"(2) Cost data should be considered as a basis for a business negotiation of a prompt and equitable settlement rather than for an attempt at an exact determination of costs. For the purpose of expediting settlements, costs should be estimated and approximated on reasonable bases, to the fullest extent practicable. Differences should be compromised and questions of doubt settled by agreement.

"(3) The scope and function of cost principles and cost data, as outlined above, are not changed by the issuance of Termination Cost Memorandums by the Director of Contract Settlement pursuant to General Regulation No. 14 (see paragraph 552.3). These Memorandums are designed to promote greater uniformity in the interpretation of the cost principles, but the principles themselves, in so far as they apply to negotiated settlements, are intended only as a general guide and not in any way as an inflexible rule."

Paragraph 552.3 of said Joint Termination Regulation provides as follows:

"Interpretation in both formula and negotiated settlements.—(1) To promote uniformity in the interpretation of the Statement of Cost Principles, the Director of Contract Settlement has issued General Regulation No. 14, including Termination Cost Memorandums numbered 1 through 9

388

(see Appendix B). Additional Memorandums will be issued as required from time to time

"(2) These Memorandums represent an acceptable standard of accuracy in the accounting treatment of the costs to which they relate. They are intended to serve as accounting aids to personnel of prime contractors, subcontractors, and contracting agencies. Their function is to interpret, not to expand, the Statement of Cost Principles; and accounting data may be accepted when determined on bases different from those set forth in the Memorandums if such bases represent recognized commercial accounting practices and yield equitable results."

It is undisputed that since 1913, when the Wisconsin Income Tax Statute was enacted, plaintiff included the Wisconsin income tax as an item of costs in its estimates when establishing a selling price, and it has consistently and regularly charged it as a cost item in its manufacturing contracts and carried it since said date on its books as an item of administrative cost and expense under a recognized commercial accounting practice

It appears from the evidence that plaintiff's method of accounting in charging the State income taxes as an item of expense is a recognized method of accounting consistent with recognized commercial practice, which practice has been and is now followed by large manufacturers operating in Wisconsin, such as, Socony-Vacuum Company, J. I. Case, Briggs & Stratton, Schenley's and United States Steel Corporation

The Wisconsin State income tax cannot be determined until the close of the calendar or fiscal year, and is not payable unless the corporation's return shows a taxable profit during the year. If plaintiff had not earned a profit during the year involved in this action it would not have been entitled to charge the Wisconsin State income tax as an item of expense. However, the proof establishes the fact that plaintiff did make a profit that year and paid a tax thereon. The tax is an item of expense of the performance of the contract. In other settlement contracts defendant has allowed as items of cost, the amount the various manufacturing concerns paid for a franchise tax based on its net income tax. While this is strictly a tax on the right to do business it is somewhat similar to a state income tax which, if not paid, would sooner or later deprive the concern owing it of the right to continue in business in Wisconsin. If a franchise tax based on net income is allowed as an item of costs to contractors on the war contracts in other states, it seems in all fairness that the Wisconsin income tax based on net income should be allowed as a cost item to plaintiff to enable it and other Wisconsin manufacturers to compete on an equal basis with manufacturers in other states that have the franchise tax statute

The Government's contracting officer in refusing to allow the Wisconsin income tax as an item of costs acted arbitrarily and without reasonable basis. The failure of defendant's officers to include Wisconsin State income tax as a cost item was a denial of fair compensation to plaintiff in the settlement contract. The proper method of computing the amount of the income tax to be allowed as an item of costs upon termination of plaintiff's subcontract in question is on the net income it received under the settlement agreement, which is $833.40, and plaintiff is entitled to judgment against defendant for the sum of $833.40 with interest.